*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0094p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES SECURITIES AND EXCHANGE
COMMISSION,

                        *Plaintiff-Appellee*,

    *v.*

SIERRA BROKERAGE SERVICES, INC., c/o
Jeffrey A. Richardson, President, et al.,

                        *Defendants*,

AARON TSAI,

                        *Defendant-Appellant.*

No. 10-3546

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:03-cv-326—Algenon L. Marbley, District Judge.

Argued: October 11, 2012

Decided and Filed:  April 4, 2013

Before:  BATCHELDER, Chief Judge; GIBBONS, Circuit Judge; and
ROSENTHAL, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Ronald E. DePetris, Southampton, New York, for Appellant.  Hope Hall
Augustini, SECURITIES AND EXCHANGE COMMISSION, Washington, D.C., for
Appellee. **ON BRIEF:** Ronald E. DePetris, DEPETRIS & BACHRACH, LLP, New
York, New York, Matthew T. Anderson, LUPER NEIDENTHAL & LOGAN,
Columbus, Ohio, for Appellant.  Hope Hall Augustini, David Lisitza, SECURITIES
AND EXCHANGE COMMISSION, Washington, D.C., for Appellee.

---

[*] Honorable Lee Rosenthal, United States District Judge for the Southern District of Texas, sitting
by designation.

———————————

**OPINION**

———————————

ALICE M. BATCHELDER, Chief Judge.    The Securities and Exchange Commission filed this civil enforcement action against twelve Defendants, alleging that they violated registration, disclosure, and anti-fraud provisions of federal securities law. The SEC moved for summary judgment against the Defendants, and the Defendants made a cross-motion for summary judgment.   The district court granted the SEC's motion in part and denied it in part, granted permanent injunctions against the Defendants, and denied the Defendants' cross-motion. On appeal, Defendant-Appellant Aaron Tsai challenges the grant of summary judgment and permanent injunction against him.  For the reasons that follow, we AFFIRM.

**I.**

The district court explained the "reverse merger" process that led to the SEC's claims against Tsai in this case:

> This case centers on Defendant Tsai's creation of MAS Acquisition XI Corporation ("MAS XI"), a "shell" company that ultimately merged with Bluepoint and sold shares to the public on the Over-the-Counter Bulletin Board in March of 2000.  The SEC maintains that the Defendants' conduct relating to that process repeatedly violated the federal securities laws.
>
> "Shell companies," like MAS XI, . . . are formed with the purpose of qualifying for public trading on the Over-the-Counter Bulletin Board and later being sold to a privately-held company.  The private company is then merged into the shell.  To accomplish the reverse merger, the public shell company exchanges its stock with the outstanding shares of the private company.  The shareholders in control of the shell company transfer most of their shares to the owners of the private company.
>
> The public shell company often changes its name to the name previously used by the private company and continues the business activity of the formerly private company except that the company is now an issuer of publicly traded securities.

*SEC v. Sierra Brokerage Servs., Inc.*, 608 F. Supp. 2d 923, 927 (S.D. Ohio 2009). A reverse merger enables a private company to access public markets without undertaking the expensive process of an initial public offering. *See SEC v. Kern*, 425 F.3d 143, 146 (2d Cir. 2005). This inexpensive way to "go public" creates a market for shell companies.

Tsai is the only Defendant on appeal, though there are other Defendants who play significant roles in this case. Tsai has formed over 100 shell companies. No neophyte in the world of securities, Tsai has been a registered representative of multiple brokerage firms and has passed five exams related to the securities industry. The SEC has sued Tsai once before, though in that case Tsai consented to the final judgment without admitting or denying the allegations him, and the judgment came several years after the events leading to the instant suit. *See SEC v. Surgilight, Inc.*, Lit. Rel. No. 19169, 85 SEC Docket 391, 2005 WL 770873 (Apr. 6, 2005).

Tsai incorporated MAS Acquisition XI Corporation ("MAS XI," and "Bluepoint" after the reverse merger occurred), the issuer of the stock in this case, in Indiana in 1996, and he served as its CEO, president, and treasurer from the outset. Even though MAS XI's bylaws required three directors as of the date on which the bylaws took effect, Tsai was MAS XI's only director at that time. After its incorporation, MAS XI issued 8.5 million shares of common stock to Tsai, but he reported beneficial ownership of only 8.25 million shares to the SEC.

To make MAS XI attractive for a reverse merger, Tsai pursued clearing the company's stock for trading on the Over-the-Counter Bulletin Board ("OTCBB"), a public securities market that the National Association of Securities Dealers ("NASD") oversaw. To prepare MAS XI for clearance on the OTCBB, Tsai used thirty-three initial shareholders of MAS XI ("thirty-three shareholders"). The thirty-three shareholders consisted of two groups. Five individuals were in the first group. Tsai claimed they were former directors of MAS XI, but admitted that three of them never actually performed any services for MAS XI and that he could not remember whether the other two had performed any services. In fact, the "former directors" never participated in a

board meeting of any kind. Notwithstanding the former directors' lack of involvement, Tsai had MAS XI issue a small number of shares to each of the former directors in 1997 and again in 1998 as "compensation for their services." In 1997, Tsai also gave 50,000 shares of his own to each of the five former directors. This transfer accounts for the 250,000 shares as to which Tsai reported no beneficial ownership to the SEC.

The second group within the thirty-three shareholders (the twenty-eight "additional shareholders") entered the scene after Tsai's initial and failed attempt to have MAS XI cleared for public trading. The NASD had rejected Tsai's initial "Form 211" filing—a securities listing application form that needed the NASD's approval before MAS XI's stock could be quoted on the OTCBB—because MAS XI's shares were concentrated in the hands of only five shareholders. Following the NASD's rejection, Tsai accordingly transferred shares from the five former directors to the twenty-eight additional shareholders, who were his friends or acquaintances.

Tsai made these transfers using stock powers, which are powers of attorney over securities, that the five former directors had signed in advance of any transfer and perhaps as early as the time they became shareholders. In his preparations for reverse mergers, Tsai had a practice of obtaining shareholders' signatures on stock powers prior to specific transfers of their stock. He did this to preempt delays that might occur if he had to track those shareholders down and obtain their signatures months or years later. In this case, Tsai recalled that after he obtained the former directors' signatures he likely went back and typed information onto the blank stock power forms. Tsai accordingly transferred some of the former directors' stock to the twenty-eight additional shareholders; he admitted to deciding arbitrarily the amounts of stock each of the additional shareholders received. It should be noted that Tsai obtained stock powers from each of the twenty-eight additional shareholders as well. And, once Tsai held signed stock powers, he did not need any other document to transfer the thirty-three shareholders' stock.

With the total number of shareholders at thirty-three, Tsai succeeded in his second attempt to obtain clearance for public trading from the NASD. Tsai turned to the

next stage of his plans: the reverse merger. Another set of entities (the "promoter Defendants") played a significant role in the events surrounding the reverse merger and leading to the suit against Tsai. They include Yongzhi Yang (a business consultant), K&J Consulting (Yang's company, which he used to trade unregistered shares of MAS XI which, by that time, had become Bluepoint), Michael Markow (a financial consultant with experience in reverse mergers), Global Guarantee (Markow's company, which he used to trade unregistered shares of Bluepoint), Francois Goelo (who introduced Yang to Markow, and controlled two companies that he used to trade unregistered shares of Bluepoint), Ke Luo (who helped pay Tsai for his efforts), and M&M (Luo's company, which he used to trade unregistered shares of Bluepoint).

In December of 1999, Yang was working as a consultant for a Chinese software company (that later became Bluepoint) that was seeking a U.S. shell for a merger. Goelo knew Yang and introduced Yang to Markow. Tsai recalled Markow's contacting him to discuss the possibility of a reverse merger with Bluepoint. The collective efforts of Goelo, Yang, and Markow paid off on January 7, 2000, when Tsai and Bluepoint's CEO formally agreed to a reverse merger.

Tsai had MAS XI declare a 15-for-1 stock split. That stock split multiplied the thirty-three shareholders' stock to approximately 3.75 million shares. Markow, working to facilitate the sale of the stock, told Tsai that he had arranged a group of investors eager to buy from the thirty-three shareholders. Tsai accordingly created stock certificates for the thirty-three shareholders' stock. These certificates had never been issued in the first place; instead, the thirty-three shareholders' ownership had only been recorded as book entries. Tsai mailed the certificates and stock powers to Markow, who sent each of the thirty-three shareholders $100, for a total of $3,300, regardless of how many shares each one held. Tsai testified that most of the thirty-three shareholders probably had no knowledge of the reverse merger or of their shares' having been cleared for public trading before Tsai sent their certificates and stock powers to Markow.

Tsai received a check, written to his company MAS Capital, Inc., for $250,000 from Markow, who had received wire transfers—that together totaled approximately

$250,000—from Goelo, Yang, and Luo. Tsai received the $250,000 for transferring the stock of the thirty-three shareholders, which Tsai acknowledged.

On February 22, 2000, Markow ordered that the thirty-three shareholders' stock be re-certified in the names of the promoter Defendants, companies they controlled, and their relatives and friends. Less than one month later, on March 6, 2000, Bluepoint shares began trading on the OTCBB. The promoter Defendants publicly sold their unregistered shares in Bluepoint.

The SEC filed a civil enforcement action against the twelve Defendants, including Tsai. In Count I, the SEC claimed that Tsai violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77e(a), (c), by trading securities in interstate commerce without filing registration statements. In Counts VIII and IX, the SEC alleged that Tsai failed to disclose his beneficial ownership of securities in violation of Section 13(d) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78m(d)(1)-(2), and Rules 13d-1(a) and 13d-2(a) thereunder, 17 C.F.R. § 240.13d-1,-2, and that Tsai violated Section 16(a) of the Exchange Act, 15 U.S.C. § 78p(a), and Rule 16a-3 thereunder, 17 C.F.R. § 240.16a-3.

The SEC moved for summary judgment against Tsai on Counts I, VIII, and IX; Tsai made a cross-motion for summary judgment. The district court granted the SEC's motion for summary judgment against Tsai on all three Counts, granted a disgorgement order against Tsai for $250,000 plus $101,987 in prejudgment interest, and permanently enjoined Tsai from violating the registration and disclosure provisions. The court denied Tsai's cross-motion for summary judgment.

On appeal, Tsai makes four arguments. First, he argues that the district court erred by permitting the SEC to move for summary judgment on the basis of an alleged "non-fraud-based" violation of Section 5's registration requirements when, Tsai alleges, the SEC's complaint and interrogatory answers only indicate a "fraud-based" theory of violation. Tsai argues that this shift prejudiced his defense. Second, Tsai argues that the district court erred by holding that SEC Rule 144(k) did not apply to the sale of the unregistered securities. Third, he argues that the district court erred by granting

summary judgment with respect to his reporting violations under the Exchange Act. Finally, he argues that the district court erred in issuing the injunction.  We consider and reject each argument.

## II.

This court reviews de novo an order granting summary judgment. *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006).  A court must grant "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In making this determination, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Tysinger*, 463 F.3d at 572.  The ultimate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  But "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Id.* at 247-48.  "[T]he substantive law will identify which facts are material," and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.  Finally, the standard of review for cross-motions of summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

## A.

Before presenting his other challenges, Tsai argues that the SEC's alleged variance from a "fraud-based" claim in its complaint to a "non-fraud-based" claim in its motion for summary judgment prejudiced his defense because he did not seek discovery from the NASD that he otherwise would have sought to defend against such a theory. Tsai asserts that the SEC belatedly shifted from characterizing the thirty-three

shareholders as nominees to characterizing them as real owners of MAS XI stock, and that the district court wrongly permitted that shift.

Our reasoning in *Colonial Refrigerated Transportation, Inc. v. Worsham*, 705 F.2d 821 (6th Cir. 1983), provides a framework for addressing Tsai's argument. In that case, we explained federal pleading and when prejudicial variance should prevent recovery:

> The function of an affirmative federal pleading, under Fed. R. Civ. P. 8(a)(2), is to give the opposing party fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved. The "theory of the pleadings" doctrine, under which a plaintiff must succeed on those theories that are pleaded or not at all, has been effectively abolished under the federal rules. . . . [T]he federal rules, and the decisions construing them, evince a belief that when a party has a valid claim, he should recover on it regardless of his counsel's failure to perceive the true basis of the claim at the pleading stage . . . provided that such a shift in the thrust of the case does not work to the prejudice of the opposing party.

*Id.* at 825 (citations and internal quotation marks omitted).

The SEC's argument does not cause a "shift in the thrust of the case" that would prejudice Tsai because the SEC's initial complaint specifically identifies the legal and factual bases for its claims. Count I of the SEC's complaint explicitly alleges violations of Sections 5(a) and 5(c) of the Securities Act. It then alleges that:

> From February 2000 through at least July 2000, Defendant[] Tsai . . . directly or indirectly made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and sell securities through the use or medium of a prospectus or otherwise when no registration statement has been filed or was in effect as to such securities and when no exemption from registration was available.

By listing Sections 5(a) and (c), and by alleging facts that relate to Section 5's elements, the SEC alerted Tsai to the legal and factual bases for his liability. And, though the SEC's complaint labeled MAS XI's shareholders as being nominees and not real owners, it adequately identified the underlying factual issue: how to characterize Tsai's

relationship to the thirty-three shareholders.  Hence, the district court correctly permitted the SEC to advance this non-fraud-based argument.

**B.**

The Securities Act and the required filing of registration statements under Section 5 exist to protect investors by requiring they receive sufficient information to make informed investment decisions.  *See SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953).  Sections 5(a) and 5(c) of the Securities Act together require that securities be registered before they can be sold or offered for sale.  15 U.S.C. § 77e(a), (c); *see SEC v. Holschuh*, 694 F.2d 130, 137 (7th Cir. 1982).  A party can violate the registration requirements of Sections 5(a) and (c) of the Securities Act through even indirect involvement in the public sale of unregistered securities.  Some securities sales, though, are exempt from registration requirements, 15 U.S.C. § 77d; *SEC v. Cavanaugh*, 155 F.3d 129, 133 (2d Cir. 1998), and Tsai claims the sales of securities in this case are exempt and that the district court inappropriately made findings of fact in its analysis.

Section 4(1) of the Securities Act, 15 U.S.C. § 77d(a)(1), provides that Section 5's registration requirements shall not apply to "transactions by any person other than an . . . underwriter."  The Securities Act defines an "underwriter" as

> any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking . . . .

15 U.S.C. § 77b(a)(11).  Recognizing the extent of a "distribution" is key to accurately identifying underwriters.  "The term 'distribution' refers to the entire process in a public offering through which a block of securities is dispersed and ultimately comes to rest in the hand of the investing public."  *Geiger v. SEC*, 363 F.3d 481, 487 (D.C. Cir. 2004) (citation and internal quotation marks omitted).

The SEC adopted Rule 144[1] to help determine whether someone is engaged in a distribution and, hence, is an underwriter:  individuals who satisfy Rule 144's safe harbor are not underwriters for purposes of Section 4(1).  17 C.F.R. § 230.144 (2012). The exemption that Tsai claims applies to the promoter Defendants' sale of unregistered securities is found in 17 C.F.R. § 230.144(k) (2000).  Rule 144(k) prevents Section 5's registration requirements from applying to

> restricted securities sold for the account of a person who is not an affiliate of the issuer at the time of the sale and has not been an affiliate during the preceding three months, *provided a period of at least two years has elapsed since the later of the date the securities were acquired from the issuer or from an affiliate of the issuer*.

17 C.F.R. § 230.144(k) (2000) (emphasis added).  For purposes of Rule 144(k), "[a]n 'affiliate' of an issuer is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."  17 C.F.R. § 230.144(a)(1) (2000).

Acknowledging that Rule 144 does not define "control," the Second Circuit has found that

> Rule 405 of Regulation C establishes a definition of "affiliate" identical to that of Rule 144 and defines "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person whether through the ownership of voting securities, by contract, or otherwise."

*Kern*, 425 F.3d at 149 (quoting 17 C.F.R. § 230.405).  In *Kern*, the Second Circuit applied that definition of "control" and found that the defendants controlled the shareholders and issuers, making the shareholders "affiliates" and ensuring that Rule 144(k)'s safe harbor did not apply.  *Id.* at 149-50.  *Kern* is instructive here.

---

[1]The SEC revised Rule 144 in 2007 such that today's Rule 144, 17 C.F.R. § 230.144 (2012), has reserved subsection (k). *See* Revisions to Rules 144 and 145, 72 Fed. Reg. 71,546, 71,547 (Dec. 17, 2007) ("Rule 144[k], as it existed before today's amendments, permitted a non-affiliate to publicly resell restricted securities without being subject to the above limitations if the securities had been held for two years or more, provided that the security holder was not, and, for the three months prior to the sale, had not been, an affiliate of the issuer."); *id.* at 71,547 n.23.  Unless we note otherwise, in this opinion we refer to Rule 144 and 144(k) as they were in 2000.

In *Kern*, the SEC had sued the defendants for selling the unregistered securities of companies that were created for reverse mergers. *Id.* at 145-47. The Second Circuit affirmed the district court's grant of partial summary judgment to the SEC, and held in part that the sales did not qualify for the Rule 144(k) safe harbor. *Id.* at 145, 149-50. The Second Circuit found that the defendants had controlled two of the shell companies and their shareholders, which placed both the shell companies and shareholders under the defendants' common control, making the shareholders affiliates for purposes of Rule 144(k). *Id.* at 149-50.

The defendants had distributed the stock of the shell companies to friends and family. *Id.* at 146. They then bought the shell companies' shares back from the "friends and family," and the shares were eventually sold on the public market. *Id.* The Second Circuit found that what demonstrated the defendants' control over the shareholders was the defendants' ability "to garner overwhelming proportions of [the shell companies'] stock at a fraction of the price at which it was sold." *Id.* at 150. The court noted that it did "not intimate that such overwhelming proof of control exercised here is necessary to satisfy the broad definition of 'control' for the purposes of Rule 144, but it is clearly sufficient." *Id.* at 150 n.3.

Our review of the circumstances of this case in light of *Kern* persuades us that the district court judge here properly concluded there was no genuine dispute of material fact over whether the thirty-three shareholders were MAS XI's affiliates. Given that the $250,000 Tsai received motivated his transfer of the thirty-three shareholders' stock—whether it motivated him directly by functioning as a purchase price for the stock or indirectly by functioning as compensation for his role in the reverse merger—that $250,000 is significantly higher than the low price of $3,300 that the thirty-three shareholders received when Tsai transferred their shares. That differential demonstrates Tsai's control.

Another fact shows Tsai's control over the thirty-three shareholders. Unlike the defendants in *Kern*, who had to purchase stock from shareholders before they could profit from it, all Tsai had to do was employ the stock powers that the thirty-three

shareholders had signed in advance of the reverse merger.  Even if Tsai, as he claims, acted within the bounds of what the stock powers and thirty-three shareholders authorized him to do, that authorization does not negate his control.  The district court correctly noted that "the fact that the shareholders may have agreed, however unwittingly, to have their shares controlled by Tsai does not alter the fact that he exerted control over their shares."  *Sierra*, 608 F. Supp. 2d at 946.  Tsai does not dispute that he controlled the issuer, MAS XI, during the relevant time.  And the promoter Defendants both acquired *and* sold the affiliates' stock in 2000, well before Rule 144(k)'s required two-year holding period had elapsed.  *See* 17 C.F.R. § 230.144(k) (2000).

We hold that there is no genuine dispute with respect to the facts undergirding the conclusion that Tsai controlled the shareholders.  His control over them and MAS XI renders the Rule 144(k) safe harbor unavailable, makes the promoter Defendants underwriters, and ultimately means the registration requirements of Section 5 applied to these transactions.

## C.

Along with registration requirements for the sales of securities, the SEC imposes disclosure requirements.  Tsai's appeal implicates two provisions of the Exchange Act, and both require owners of securities to report their ownership of stock when their holdings exceed certain thresholds.  Promulgated pursuant to the Exchange Act, Rule 13d-1(a) requires that any

> person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is specified in paragraph (i) of this section, is directly or indirectly the beneficial owner of more than five percent of the class shall, within 10 days after the acquisition, file with the Commission, a statement containing the information required by Schedule 13D (§ 240.13d-101).

17 C.F.R. § 240.13d-1(a).  In defining "beneficial owner," Rule 13d-3(a) provides that a

> beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:  (1) Voting power which

includes the power to vote, or to direct the voting of, such security; and/or, (2) Investment power which includes the power to dispose, or to direct the disposition of, such security.

17 C.F.R. § 240.13d-3(a).

The analysis necessary to determine whether Tsai was a beneficial owner with "investment power" over the thirty-three shareholders' stock resembles the analysis that showed his control over those shareholders. Tsai did not report ownership of the 250,000 shares that the thirty-three shareholders held. Tsai explains that this omission was because he did not own the thirty-three shareholders' stock. But the Rule's definition of "beneficial owner" does not turn on the formal legality of a beneficial owner's relationship to shareholders; what is relevant is his power to dispose of or direct the disposition of their stocks. Even assuming, as Tsai claims, that he fully explained to shareholders that the stock powers would only be used in the context of a reverse merger, that explanation did not negate his actual investment power. At the end of the day, Tsai held stock powers that the thirty-three shareholders signed in advance; he could and did use their shares as he saw fit. Accordingly, Tsai should have disclosed his beneficial ownership of the shares.

SEC Rule 16a-3, 17 C.F.R. § 240.16a-3, also promulgated pursuant to the Exchange Act, has a "beneficial ownership" reporting requirement similar to that of Rule 13d-1. Determining who is a "beneficial owner" under this Rule means identifying

any person who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares a direct or indirect *pecuniary interest* in the equity securities, subject to the following: (i) The term pecuniary interest in any class of equity securities shall mean the *opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities.*

17 C.F.R. § 240.16a-1(a)(2) (emphasis added).

Given the breadth of the definition of "pecuniary interest," it is futile for Tsai to contend that he did not have an opportunity to share indirectly in a profit derived from a transaction in the thirty-three shareholders' securities. Tsai asserts that he could not

have had a pecuniary interest at the time the thirty-three shareholders received the stock because that interest would have been too speculative. But, in fact, Tsai's opportunity for profit through the ultimate sale of the stock after a reverse merger existed at the time the thirty-three shareholders acquired the stock and signed the stock powers. Indeed, the stock of MAS XI—a shell corporation—had little or no value but for the possibility of a reverse merger.

And even if the $250,000 Tsai received is characterized as a fee for Tsai's services in the reverse merger rather than as a direct payment for the thirty-three shareholders' stock, that sum is still evidence that Tsai capitalized indirectly on an opportunity to share in profit derived from a transaction involving the thirty-three shareholders' stock. Tsai's argument that the shareholders received economic benefit ignores that the definition of "pecuniary interest" includes the opportunity to *share* in any profit derived from that transaction. The $3,300 the shareholders received from Markow for their shares does not, therefore, negate Tsai's ability to profit and, accordingly, his obligation to report his ownership.

## D.

The district court permanently enjoined Tsai from violating registration requirements of the Securities Act and reporting requirements of the Exchange Act.[2] Tsai's arguments on appeal do not address the injunction as it applies to the Exchange Act and, hence, he has waived any challenge to that aspect of the injunction. *United States v. Sandridge*, 385 F.3d 1032, 1035-36 (6th Cir. 2004).

This Court reviews for abuse of discretion the district court's granting an injunction. *SEC v. Youmans*, 729 F.2d 413, 415 (6th Cir. 1984). The district court here

---

[2]As we note below, this is not Tsai's first injunction, *see SEC v. Surgilight, Inc.*, Lit. Rel. No. 19169, 85 SEC Docket 391, 2005 WL 770873 (Apr. 6, 2005), although that 2005 injunction differs significantly from the one now under our consideration. The 2005 injunction arose in an entirely separate case and was issued in another jurisdiction. *Id.* It was issued with Tsai's consent and without his "admitting or denying the [SEC's] allegations." *Id.* And the 2005 injunction was narrower than the injunction here, which prohibits Tsai from violating disclosure requirements under "Sections 13(d)(1) and 16(a) of the Exchange Act [15 U.S.C. §§ 78m(d)(1) and 78p(a)] and Rules 13d-1 and 16a-3 thereunder [17 C.F.R. §§ 240.13d-1(a) and 240.16a-3]" in addition to prohibiting his violation of registration requirements. *Sierra*, 608 F. Supp. 2d at 974 (alterations in original).

abused its discretion if it "relie[d] on erroneous findings of fact, applie[d] the wrong legal standard, misapplie[d] the correct legal standard when reaching a conclusion, or ma[de] a clear error of judgment." *Pipefitters Local 636 Ins. Fund v. BCBS of Mich.*, 654 F.3d 618, 629 (6th Cir. 2011) (citation and internal quotation marks omitted).

A permanent injunction is appropriate where the SEC has shown "a reasonable and substantial likelihood that [Tsai], if not enjoined, would violate the securities laws in the future." *Youmans*, 729 F.2d at 415. The Sixth Circuit has identified seven factors that are relevant to determining whether there is a reasonable and substantial likelihood of future violations:

> (1) the egregiousness of the violations; (2) the isolated or repeated nature of the violations; (3) the degree of scienter involved; (4) the sincerity of the defendant's assurances, if any, against future violations; (5) the defendant's recognition of the wrongful nature of his conduct; (6) the likelihood that the defendant's occupation will present opportunities (or lack thereof) for future violations; and (7) the defendant's age and health.

*SEC v. Quinlan*, 373 F. App'x 581, 585-86 (6th Cir. 2010) (quoting *Youmans*, 729 F.2d at 415) (internal quotation marks omitted). No single factor is determinative. *Youmans*, 729 F.2d at 415.

We first note that the district court rightly applied the test of "whether the SEC had shown a reasonable and substantial likelihood" that Tsai would violate securities laws in the future. *Id.* The district court did mislabel the test when it said that the SEC needed to show only a "'reasonable likelihood'" of future violations. *Sierra*, 608 F. Supp. 2d at 971 (quoting *Holschuh*, 694 F.2d at 144). But that error is harmless because the district court still rigorously applied the seven factors from *Youmans* as the "reasonable and substantial likelihood" test requires. *See Youmans*, 729 F.2d at 415.

As part of its analysis of the *Youmans* factors, the district court found as persuasive and discussed Tsai's failure to provide sincere assurances that he will not offend in the future, his failure to recognize the wrongful nature of his conduct, his line of employment, and his failure to argue that his age and health preclude future violations. Tsai, however, focuses his attack against the injunction on the district court's scienter

finding.[3]  The inquiry under the scienter factor involves a continuum, and entails asking about the *degree* to which scienter exists.  *Youmans*, 729 F.2d at 415; *Quinlan*, 373 F. App'x at 585.  The district court found that the attendant circumstances suggest that Tsai acted recklessly in committing his violations.  Those attendant circumstances include his experience in the industry and his substantial education concerning the very regulations he violated.  They also include Tsai's alleged lie, made in his NASD Form 211 filing, about transferring shares to five former director shareholders as "compensation for services" when those directors never, in fact, provided such services and apparently served only as honorary directors.

Tsai does not challenge the court's scienter finding to the extent it rests on his industry experience and education, but argues that the district court made an inappropriate finding of fact by concluding that he lied in his Form 211 application.  Tsai claims that the five former directors served as honorary directors and were properly listed on Form 211.  Tsai's argument that the district court made an inappropriate finding of fact here could have merit—it is possible Tsai's characterization of the directors, even if incomplete, was not a lie.  But Tsai's failure to challenge the court's findings with respect to his industry experience and education means the court did not abuse its discretion in finding he had at least some degree of scienter.

More importantly, even if Tsai's challenges to the district court's scienter finding were entirely well-grounded and Tsai lacked any degree of scienter, he would not be able to show the district court abused its discretion in granting an injunction.  The absence of scienter alone does not determine whether an injunction is appropriate.  *See Youmans*, 729 F.2d at 415 (noting that "courts have taken care to stress that no one factor is

---

[3]Tsai also challenges the district court's focus under the second factor—"the isolated or repeated nature of the violations"—on Tsai's involvement in another case in which a shell company was used to facilitate a reverse merger.  *See Surgilight*, 85 SEC Docket 391.  That case left Tsai enjoined from violating the registration requirements of Sections 5(a) and 5(c) of the Securities Act.  *Id.*  Tsai is correct that the 2005 injunction was issued after, and so did not apply to, Tsai's actions that led to the current litigation.  But the existence of any injunction at all is part of Tsai's history and, under the second factor, is evidence that he is a repeat violator and at least suggests the possibility of his violating securities laws in the future.  Hence, the 2005 injunction tends to support the district court's decision to issue an injunction, a decision also in accord with the Seventh Circuit's pronouncement that "Tsai and his corporations take the law . . . entirely too lightly."  *MAS Capital, Inc. v. Biodelivery Sciences Int'l, Inc.*, 524 F.3d 831, 833-34 (7th Cir. 2008).

determinative"). Indeed, had the district court refused to grant the injunction based solely on a finding that Tsai did not have scienter, it would have abused its discretion by making that single factor determinative. *Id.* at 416 (holding that the "district court abused its discretion by focusing exclusively on the change of occupation factor").

In light of all the *Youmans* factors, the district court did not abuse its discretion by enjoining Tsai from violating registration and disclosure requirements.

## III.

For the foregoing reasons, we **AFFIRM** the district court's granting summary judgment and a permanent injunction against Tsai.