UNITED STATES of America, ex rel. Kevin P. McDONOUGH, et al., Plaintiff–Relator,

v.

SYMPHONY DIAGNOSTIC SERVICES, INC., and Symphony Diagnostic Services No. 1, Inc., d/b/a Mobilex, U.S.A., et al., Defendants.

Case No. 2:08–CV–00114.

United States District Court, S.D. Ohio, Eastern Division.

Signed Aug. 12, 2014.

---

107. *Id.*

Donetta Donaldson Wiethe, U.S. Department of Justice, Wilbert Benjamin Markovits, Markovits, Stock & DeMarco LLC, Cincinnati, OH, Andrew M. Malek, United States Attorney's Office, Marc Orlow, Regina Poserina, Ross Begelman, Begelman, Orlow & Melletz, Cherry Hill, NJ, Columbus, OH, for Plaintiff–Relator.

Robert G. Cohen, Kegler Brown Hill & Ritter, Columbus, OH, Brian Stimson, Brittany F. Reese, Wade Pearson Miller, William H. Jordan, Alston & Bird LLP, Atlanta, GA, for Defendants.

### OPINION & ORDER

ALGENON L. MARBLEY, District Judge.

This matter is before the Court on the parties' cross-motions for summary judgment. Defendants Symphony Diagnostic Services, Inc., and Symphony Diagnostic Services, No. 1, Inc., d/b/a Mobilex U.S.A. (collectively "Mobilex") move for summary judgment in their favor as to all claims, on the grounds that the Relator cannot show a genuine issue of material fact as to the elements of remuneration, inducement, and *scienter*. (Doc. 105). Relator Kevin McDonough seeks partial summary judgment in his favor as to the liability of

Defendants for false claims related to two particular facility contracts, as to the proper definition of "costs" under the relevant statutes, and as to Mobilex's ninth affirmative defense. (Doc. 107).

For the reasons set forth herein, Defendants' Motion is **GRANTED;** Plaintiff's Motion is **DENIED.** The case is hereby **DISMISSED.**

## I. BACKGROUND

This case concerns allegations that Mobilex has engaged in large-scale violations of the False Claims Act, 31 U.S.C. §§ 3729–3733 ("FCA"), by way of violations of the Anti–Kickback Statute, 42 U.S.C. § 1320a–7b ("AKS"). Mobilex is the largest provider of mobile, on-site x-ray and other diagnostic services in the United States. Its customers are various institutions that provide health care, including long-term acute care hospitals, prisons, and, particularly relevant here, skilled nursing facilities ("SNFs"). SNFs typically have patients covered under both Part A and Part B of Medicare, as well as under private insurance. For the vast majority of its contracts, Mobilex is the only provider of mobile x-ray services at that SNF. (*Dep. of William Glynn of Nov. 2, 2012 ("Glynn I"),* Doc. 105–5, at 66:6–10). In short, Relator alleges that Mobilex priced its Part A services impermissibly low in order to get Part B business, violating the AKS.

Generally, 40% of Mobilex's SNF patients are covered through Medicare Part A, 40% through Part B, and 20% through private health care coverage or other types of insurance. (*Dep. of William Glynn of June 27, 2013 ("Glynn II"),* Doc. 105–4, at 11:8–12:16). Mobilex often learns what sort of insurance an individual is covered by only after providing services to the patient. (*Glynn I* at 41:2–5, 1037–23, 145–46). For patients covered under Part A,

Mobilex bills the SNFs directly, which pay Mobilex at rates established by negotiated contracts between Mobilex and the SNFs. *Centers for Medicare & Medicaid Servs. ("CMS")* Pub. 100–4, ch. 13 § 20.2.1 (Rev. 2750, Aug. 2, 2013); *id.* at ch. 6, § 10.4 (Rev. 2573, Oct. 26, 2012). The SNFs in turn submit their own claims for payment to Medicare. *Id.* at ch. 13, § 20.2.1 (Rev. 2750, Aug. 2, 2013). Medicare then pays the SNFs at a per diem rate, which is expected to cover all of the SNFs' costs, including room and board, laboratory costs, nursing, etc. 42 C.F.R. § 413.1(g). For patients covered under Part B, Mobilex bills the Medicare program directly. CMS Pub. 100–04, Ch. 7, § 50 (Rev. 1472, Mar. 6, 2008). Medicare then pays Mobilex at rates set by the government and published in the Medicare Fee Schedule ("MFS") for each state. *Id.* at ch. 13, §§ 10.1, 90 (Rev. 2750, Aug. 2, 2013).

Often, Medicare Part B rates are higher than the Part A rates, since the Part B rates are set unilaterally, rather than through negotiation by the SNFs as with Part A. Accordingly, there is the possibility that a provider might attempt to secure a contract with a SNF by offering Part A services at deep discount, or even below-cost, in order to have access to the more lucrative Part B business, an arrangement referred to as "swapping." Relator acknowledges that "Mobilex's intent is always to follow the Medicare rules regarding the Anti-kickback Statute," (*Relator's Statement of Undisputed Facts,* Doc. 107–2, ¶ 107) (citing *Glynn II* at 33:24–34:1), and that Mobilex "intends to make money on the Part A" contracts standing alone, without regard to the value of any swapping (*id.,* ¶¶ 41, 47–48, 57) (citing *Glynn I* at 83:8–84:5). Both parties also agree that Mobilex seeks always to price its contracts, both for Part A and Part B, above Mobilex's cost to perform the service.

(*Id.,* ¶ 40) (citing *Glynn I* at 57:19–25; 59:12–14).

Relator nevertheless asserts that Mobilex has violated the AKS by pricing its Part A services below costs, as "costs" is defined by his expert. Mobilex tracks the revenues and costs of its Part A services "per patient encounter," meaning the number of times a patient was seen. (*Id.,* ¶ 49) (citing *Glynn I* at 157:21–25, 158:1–8, 86:4–22). Mobilex's method of calculating costs, however, includes only its "direct costs" of performing the service, and some "indirect costs"; it does not include "overhead costs" in its method of accounting. (*Id.,* ¶ 58). (citing *Glynn II* at 98:8–15). Moreover, when negotiating a new contract, Mobilex typically does not consider an SNF-specific "cost to serve," since, according to Mobilex, such costs could vary greatly from day to day, depending on patient volume, SNF proximity to other facilities, seasonal demands, and since Mobilex might never have served that SNF before. (*Mobilex's Mot. for Sum. J.,* Doc. 105–1, at 12).

Relator insists, and asks this Court so to rule, that the only proper measure of costs is "total costs" or "fully loaded costs," meaning that "costs" "must be construed to include both variable … and fixed expenses," including "costs related to providing the service and running a company's operations, including those costs allocated from regional or corporate headquarters." (*Relator's Mot. for Summ. J.,* Doc. 107–1, at 15). If Mobilex's costs were properly computed under this definition, Relator asserts, it would be clear that Mobilex is pricing its Part A services "below cost,"

while also receiving Part B business, thus violating the AKS.

Both parties [1] agree that the Court can resolve this issue as a matter of law. (*See Mobilex's Reply,* Doc. 131 at 5; *Relator's Mot.,* Doc. 107–1 at 17). Because the Court concludes that Relator's preferred "fully loaded costs" metric is not the only permissible measure of costs under the AKS, however, summary judgment for Defendants on all counts is appropriate.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides, in relevant part, that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 339–40 (6th Cir.1993). The suggestion of a mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment. *See Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir.1992) (citing *Gregg v. Allen–Bradley Co.,* 801 F.2d 859, 863 (6th Cir.1986)). Summary judgment is inappropriate, however, "if the

1. Although Relator's briefing suggests that a ruling on this issue is appropriate as a pure matter of law, at oral argument Relator's counsel retreated from this position, arguing instead that his expert's method of calculating

costs is mandated in this case as a matter of both law and fact. In any case, both Relator and Mobilex argue that this issue can be decided on summary judgment.

dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir.1993) (quoting *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505). In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party. *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir.2013). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson*, 477 U.S. at 251, 106 S.Ct. 2505; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir.1995).

The standard of review for cross-motions for summary judgment "does not differ from the standard applied when a motion is filed by only one party to the litigation." *Sierra Brokerage Servs.*, 712 F.3d at 327.

## III. ANALYSIS

The FCA creates civil liability for any person who "knowingly presents, or causes to be presented" to the government a "false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1). The FCA also bars false or fraudulent record or statement to get claim paid or approved by the government. *Id.* § 3729(a)(2). Relator argues that Mobilex runs afoul of the FCA by violating the AKS, since its services were allegedly "rendered to patients unlawfully referred to Mobilex by nursing homes to whom Mobilex provided kickbacks and/or illegal remuneration." (*Am. Compl.*, Doc. 36, ¶ 109).

▮ The AKS, a criminal statute, makes it illegal for a person to "knowingly and willfully offer[ ] or pay[ ] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a–7b(b)(2)(B). The law does not criminalize *referrals*; rather, it criminalizes "knowing and willful acceptance of remuneration in return for such referrals." *Klaczak v. Consol. Med. Transp.*, 458 F.Supp.2d 622, 678 (N.D.Ill.2006).

To prove a violation of the AKS, Realtor must show: (1) remuneration offered or paid; (2) in order to induce the referral of government healthcare business; (3) done "knowingly and willfully." 42 U.S.C. § 1320a–7b(b)(2)(B).

### A. Relator's Remuneration and Inducement Logic

▮ "Remuneration" can be "anything of value," *Klaczak*, 458 F.Supp.2d at 678, and Relator contends that in this case, "the significant cost savings in the form of discounts offered to the Mobilex SNFs is remuneration" (Doc. 107–1 at 12). The "gravamen of Medicare fraud is inducement," *Polk County, Tex. v. Peters*, 800 F.Supp. 1451, 1455 (E.D.Tex.1992), but Relator lacks any direct evidence such as emails, memos, comments, or other indications of inducement in the form of conventional bribery or kickbacks. *Compare Klaczak*, 458 F.Supp.2d at 680 ("Relators have not set forth any evidence specifically concerning the state of mind or intent of

any of the relevant agents ... For example, there is not a single comment, email, memo, or other indication ... that suggests the [Defendants].... were knowing and willful participants in any kickback scheme. Relators have thus been forced to attempt to establish a trial-worthy record of illicit *scienter* circumstantially.").

Relator, therefore, like the relators in *Klaczak*, attempts to show inducement circumstantially, through a chain of logical inferences, that: (1) Mobilex was the exclusive provider both Part A and Part B services at most SNFs; (2) Mobilex provided its Part A services below "cost"; (3) such below-cost pricing was a discount in order to induce referrals of Part B business; (4) Mobilex offered such inducements "knowingly" since it knew, or purposefully blinded itself to knowing, that its prices were below cost. (*Relator's Reply Br.*, Doc. 118–1 at 39). In sum, Relator argues that "the contracts were so low that the only reasonable inference to draw" is that Mobilex was offering remuneration in exchange for referrals. *See Klaczak*, 458 F.Supp.2d at 680.

Mobilex counters that its prices were in fact at or above "fair-market value" ("FMV"), defined as "the price a willing buyer would pay a willing seller ... when neither is under compulsion to buy or sell." *Id.* at 678. Mobilex argues, citing *Klaczak*, that FMV is often used as the "gauge of value when assessing the remuneration element of the offense" in the AKS context. *Id.; see also United States ex rel. Jamison v. McKesson Corp.*, 900 F.Supp.2d 683, 699 (N.D.Miss.2012) ("In the context of the AKS, courts use 'fair market value' as the gauge of value."). In this case, Mobilex concludes, it has offered extensive evidence that the mobile x-ray services market is highly competitive, and that its negotiated rates reflect that competition; accordingly, its rates are, "by

definition," FMV. (Doc. 105–1 at 34). Mobilex adds that Relator has "not even tried to do a competitive market analysis in this case," which would be necessary to show that Mobilex priced below FMV. (*Id.*).

Relator takes issue with Mobilex's eagerness to use FMV as the litmus test for remuneration. To do so, he argues, is to "construe the AKS [too] narrowly," and neither of the leading cases on "swapping" under the AKS require such a conclusion. (*Relator's Resp. Br.*, Doc. 118–1 at 14). Instead, Relator emphasizes that remuneration can be "anything of value in any form whatsoever," 56 Fed.Reg. 35952, 35958 (1991), including, as here, when a provider offers services below costs. (Doc. 118–1 at 21–22); *see, e.g., United States ex rel. Fry v. Health Alliance*, No. 1:03–CV–00167, 2008 WL 5282139, at *7–8 (S.D.Ohio Dec. 18, 2008) (finding that scheduling doctors time to work at a hospital "heart station," whereby they are provided with a "stream of patients," could be considered remuneration under the AKS, since "[g]iving a person an opportunity to earn money may well be an inducement.").

Relator also insists that using FMV as a benchmark for remuneration is suspect since, as the Department of Health & Human Services Office of Inspector General ("OIG") has explained, " 'fair market value' must reflect an arms-length transaction which has not been adjusted to include the additional value ... attributed to the referral business between [the parties]." *OIG Special Fraud Alert*, 59 Fed.Reg. 65372 (Dec. 19, 1994); *see also* 42 C.F.R. § 411.351 (2006) (noting that FMV should be the "result of *bona fide* bargaining between well-informed buyers and sellers who are not otherwise in a position to generate business for the other party.").

The Court notes that, in this case, Mobilex is by far the largest provider of mobile diagnostic services in the United States.

(*Defs' Mot.*, Doc. 105–1, at 8). It is in fact so large that, as counsel conceded at oral argument, its ability to influence the markets in which it participates is non-trivial. Indeed, the Court is troubled to consider the possibility that Mobilex is large enough that it effectively makes the market in which it participates, meaning that any consideration of FMV would be skewed by Mobilex's ability to set market rates.

But even accepting that FMV is not the proper test for remuneration in this case, Relator's argument still depends on this Court accepting that his method of calculating cost is the *only* acceptable way to determine whether a discount was provided. *See Klaczak*, 458 F.Supp.2d at 681 ("Relator['s] circumstantial proof must at least meaningfully discredit other, valid justifications for the contracts," such that "the *only* reasonable inference from the 'low' contract rates . . . is that the [ ] Defendants knowingly and willfully violated the AKS.") (emphasis in original). If the Court does not accept Relator's method, or if the Court finds that other methods of calculating costs are permissible under the AKS, Relator has failed to show a triable issue regarding whether Mobilex prices its Part A services below cost; if the services are not priced below cost, Relator lacks any evidence whatsoever to show Mobilex acted "in order to induce" referrals for its Part B services, and its case must be dismissed.

 Relator also alleges that Mobilex prices its contracts "with intentional disregard for costs," since its employees "admit that they have no idea what the word 'costs' means, or what it actually costs to perform an x-ray in a particular SNF." (Doc. 118–1 at 27). But more than this is required to save Relator's case. Such evidence cannot defeat summary judgment because it does not "tend[ ] to meaningfully exclude a legitimate (or negligent) ex-

planation for [Mobilex's] conduct." *Klaczak*, 458 F.Supp.2d at 677. And in fact both Relator and Mobilex cite to significant evidence that Mobilex does track its costs at various levels and to various degrees of specificity. (*See Glynn I* at 144–45; *Glynn II* at 98:8–15; *Dep. of Patricia Pawling*, Doc. 105–16, at 45:8–10; *Dep. of Robbin Reichert*, Doc. 105–9, at 18–19, 82–83, 134–36; *Dep. of David Williams*, Doc. 105–13, at 112). Mobilex produces "profit and loss statements" to track its revenues and certain costs at the regional, state, and "geographic cost center" levels, which are used by its regional vice presidents to make its contracting decisions. (*Glynn I* at 154–55; *Dep. of Dianna Gomez*, Doc. 105–19, at 78:10–13; *Dep. of Brian Cuomo*, Doc. 105–18, at 93–95; *Dep. of Jeff Hooper*, Doc. 105–14, at 21–22). Further, at least since 2007, Mobilex reviews its contracts when its prices fall below a certain threshold (referred to by Mobilex as a "channel marker") to ensure compliance with the AKS. (*Pawling Dep.* at 44–46, 54; *Glynn I* at 58–60; *Glynn II* at 30, 75–76). Indeed, the AKS is clear that remuneration must be offered "in order to induce" referrals; arbitrary prices set "with intentional disregard for costs" do not establish inducement. *Cf. Jamison*, 900 F.Supp.2d at 702 (holding that "[k]nowledge" for the AKS requires that "the act was done voluntarily and intentionally, not because of mistake or accident," and finding that the defendants lacked intent where their employees "were more likely negligent or careless," since such carelessness "does not evidence a willful wrong intentionally committed.") (citations omitted).

## B. Incremental costs vs. fully-loaded costs

The problem for Relator, then, is not that Mobilex does not track its costs, but rather that Mobilex does not track its

costs *in the way that Relator's expert opines it must.* Accordingly, the Court must determine whether Relator's metric of "fully loaded costs" is the only appropriate measure of costs in this context. The Court concludes that it is not.

According to Relator, "total costs" is the proper measure to be used when assessing whether remuneration by way of below-cost rates has taken place. (Doc. 107–1 at 15). Total costs, he argues, "must be construed to include both variable (often referred to as incremental costs) and fixed expenses, which are often referred to as overhead." (*Id.*). This method accounts for "both the fixed and variable costs related to providing the service and running a company's operations, including those costs allocated from regional or corporate headquarters." (*Id.*). The alternative to fully loaded costs, argues Relator, results in the costs of overhead to be shifted onto its other services, including Part B, resulting in artificially low costs for Part A services, and running afoul of the AKS. (*Id.* at 16).

Although Relator makes considerable hay of the importance of using fully loaded costs, neither he nor his expert explains why this Court is legally bound to accept such calculations. Indeed, Relator suggests that "there is no case on point as to the proper measure of costs under the AKS." (*Id.*). But Relator blinds himself to the court's well-reasoned holding in *Jamison*, where Judge Aycock, assessing a similar swapping scheme, specifically held that the defendants' use of the "incremental cost analysis to calculate anticipated profits" was a permissible measure of costs under the AKS. 900 F.Supp.2d at 700. The court explained that "fixed costs and overhead, including executive salaries and property costs, were not associated or accounted as a cost inherent in the [defendants'] business because such expenses would be incurred regardless of whether [the defendants] won the contract or not." *Id.* Despite the government's best efforts in *Jamison,* the court concluded that it "failed to present evidence that such [incremental cost] analysis was either illegal under the AKS or improper under standard accounting principles." *Id.*

For the same reasons, Relator's argument must fail here. Relator breathlessly repeats his claims that "shifting" overhead costs away from Part A services by using incremental cost analysis is "the very definition of swapping." (Doc. 107–1 at 23). But his arguments demand no such conclusion. Relator seeks succor in the OIG's advisory opinions finding that pricing below "total cost" is "suspect," meaning that it might merit further scrutiny by OIG. *See, e.g.,* OIG Advisory Opinion No. 12–09 (July 23, 2012); OIG Advisory Opinion No. 99–2 (Feb. 26, 1999). But OIG advisory opinions do not establish rules of decision, and are not to receive judicial deference. *Christensen v. Harris Cnty.,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). Moreover, OIG advisory opinions, by regulation, "have no application to any individual or entity that does not join in the request for the opinion. No individual or entity other than the requestor(s) may rely on an advisory opinion." 42 C.F.R. § 1008.53. But in any case, OIG's identification of a practice as "suspect" merely triggers further investigation by OIG; it does not render a practice *per se* illegal or unlawful, as even Relator's expert acknowledges. (*See Dep. of Kathleen McNamara,* Doc. 105–11, at 17:18–25).

The Court also notes that mandating "fully loaded costs" analysis would result in absurd results, to say the least. As Mobilex points out, changes in executive salaries or the cost of rent for its corporate headquarters, even if wholly unrelated to

delivering mobile x-ray services, could result in a contract suddenly becoming illegal, as the "total costs" of providing the services, under Relator's theory, will have increased. (*See* Doc. 117–12 at 19–20).

In sum, Relator has failed to demonstrate that his "fully loaded costs" approach is required under the AKS. Even accepting the procedural logic of Relator's argument, whereby the Court infers the requisite inducement and intent on the part of Mobilex purely from its pricing of its Part A services, and its ability to garner Part B services from contracts that are *de facto* (if not *de jure*) exclusive, Relator must still show that Mobilex has priced its services "so low" that it violated the AKS. *Klaczak,* 458 F.Supp.2d at 680. As this Court has held, *see Fry,* 2008 WL 5282139, at *7–8, the AKS's broad definition of remuneration as "anything of value" can embrace such a theory of illegality; but only if Relator can still demonstrate a "comparison point," as "no inference can be drawn from 'low' prices unless there is some higher price" to compare the discounts allegedly offered by Mobilex. *Klaczak,* 458 F.Supp.2d at 681. Pricing below costs is one such comparison—but because Relator cannot support the legal conclusion that his method of determining costs is demanded by the AKS, his entire chain of logic unravels. Relator already admits that Mobilex and its employees consistently sought to price Mobilex's Part A contracts above costs, in order to be profitable standing alone apart from any other business line. Without the circumstantial evidence of Mobilex's bad intent that his preferred method for calculating costs might have provided, his case is a hollow one.

Relator's theory relies on a string of inferences in order to infer Mobilex's knowledge and intent to induce referrals via Part A services that are priced, by whatever measure, "too low." As in *Klac-*

*zak,* however, where Judge Filip undertook an extensive review of circumstantial proof of intent under federal law, Relator's inferences are simply too strained. *See* 458 F.Supp.2d at 683 ("Assuming *arguendo* that Relators have presented sufficient evidence to support even a preliminary inference that the [defendants] knowingly and willfully entered into a kickback scheme ... the [defendants] have set forth uncontradicted evidence that the contracts were as compatible with legitimate business purposes as they were with an illegal agreement. This failing also further undermines any notion that there is a triable case."). Relator cannot establish a sufficient factual basis to support his chain of inferences, and the Court is compelled to conclude that summary judgment in favor of Defendants is required.

## IV. CONCLUSION

For the reasons states above, Defendants' Motion for Summary Judgment (Doc. 105) is **GRANTED**. Relator's Motion for Partial Summary Judgment (Doc. 107) is **DENIED**. This case is hereby **DISMISSED**.

**IT IS SO ORDERED.**